**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION**

| | |
|---|---|
| DAVID GOWERS,<br><br>         Plaintiff,<br><br>v.<br><br>TAMMIE HALEEN et al.,<br><br>         Defendants. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No. 2:11-CV-111 CW<br><br>District Judge Clark Waddoups |

Plaintiff, David Gowers, filed this *pro se* civil rights suit under 42 U.S.C. § 1983 while

incarcerated at the Central Utah Correctional Facility (CUCF).  *See* 42 U.S.C.S. § 1983 (2013).

Plaintiff was allowed to proceed *in forma pauperis*.  *See* 28 *id*. § 1915.  The Court now considers

Defendants' Motion for Summary Judgment.

**ANALYSIS**

**I.  Introduction**

Plaintiff is an inmate in the custody of the Utah Department of Corrections (UDC) who

asserts that Defendants violated his rights under the First and Fourteenth Amendments by

interfering with his right to freely exercise his religion while at CUCF.  Specifically, Plaintiff

alleges that Defendants barred him on multiple occasions from attending worship services and

other functions of The Church of Jesus Christ of Latter-day Saints (LDS) available to CUCF

inmates.  Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages,

attorneys fees and costs.

On April 10, 2012, Defendants filed a *Martinez* Report addressing Plaintiff's allegations, along with declarations of numerous officers involved with Plaintiff's claims.[1] (Doc. Nos. 41-51.) Defendants now move for summary judgment asserting that the evidence does not support the conclusion that Plaintiff's rights were violated, and even if Plaintiff could show a constitutional violation Defendants are entitled to qualified immunity because the rights at issue were not clearly established when the violations occurred.

## II. Summary Judgement Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Cellotex v. Catrett*, 477 U.S. 317, 324 (1986). The party moving for summary judgment bears the initial burden of showing "that there is an absence of evidence to support the non-moving party's case." *Cellotex*, 477 U.S. at 325. This burden may be met merely by identifying portions of the record which show an absence of evidence to support an essential element of the opposing party's case. *Johnson v. City of Bountiful*, 996 F. Supp 1100, 1102 (D. Utah 1998). Once the moving party satisfies its initial burden, "the burden then shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of [the disputed] element." *Id.* A fact in dispute is "material" only if it might affect the outcome of the suit under governing

---

[1] In *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978), the Tenth Circuit approved the practice of district courts ordering prison administrators to prepare a report to be included with the pleadings in cases where an inmate alleges a constitutional violation by prison officials.

law.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  The dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A non-movant who "would bear the burden of persuasion at trial" must "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant."  *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998).  Mere allegations and references to the pleadings will not suffice, instead, the specific facts put forth by the non-movant "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein."  *Thomas v. Wichita Coca-Cola Bottling*, 968 F.2d 1022, 1024 (10th Cir. 1992).  Moreover, "the nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient."  *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).  The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion."  *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

### III.  Material Facts

The following facts form the basis for Plaintiff's claims and Defendants' summary judgment motion.[2]

---

[2]  The facts presented here are drawn from Defendants' Memorandum in Support of Motion for Summary Judgment (Doc. No. 61) and Plaintiff's Memorandum in Opposition (Doc. No. 64). Although areas of disagreement are noted, as discussed below, these disputes are not deemed to be genuine for purposes of resolving this motion.

**Parties**

1.      Plaintiff, David Karl Gowers, is an inmate at CUCF in Gunnison, Utah.  (Compl. (Doc. No. 5) at 1.)

2.      Tammie Haleen was, at all relevant times, a Corrections Officer at CUCF assigned to the Boulder Programming Area.  (*Id.* at 1–2 ¶ 3.) (Decl. of Tammie Haleen ("Haleen Decl.")(Doc. No. 44) at 1–2 ¶¶ 2-4.)

3.      Frank Estey was, at all relevant times, a Corrections Officer at CUCF assigned to the Boulder Programming Area.  (Compl. at 2 ¶ 4; Decl. of Frank Estey ("Estey Decl.") (Doc. No. 45), at 1-2, ¶¶ 2–4.)

4.      Captain Devon Blood was, at all relevant times, the Programming Captain at CUCF assigned to the Boulder Programming Area.  (Compl. at 2 ¶ 5; Decl. of Captain Devin Blood ("Blood Decl.)(Doc. No. 59) at 2 ¶¶ 2–4).

5.      Lt. Vaun Christensen was, at all relevant times, the Programming Lieutenant over the Boulder Programming Area at CUCF.  (Compl. at 3 ¶ 6.)

6.      Heidi Johnson was, at all relevant times, a Correctional Specialist, or caseworker assigned to Plaintiff at CUCF.  (*Id.* at 4 ¶ 7; Decl. of Heidi Johnson ("Johnson Decl.") (Doc. No. 46) at 2 ¶ 5.)

7.      Lt. Robert Painter was, at all relevant times, a correctional officer assigned to CUCF with the rank of Lieutenant.  (Compl. at 4 ¶ 8.)

8.      Captain Michael Allen was, at all relevant times, a corrections officer at CUCF with the rank of captain.  (*Id*. at 4 ¶ 9.)

4

9.      Doyle Cutler is employed at CUCF.  (*Id*. at 4 ¶ 10.)

10.     Captain Melvin Coulter was, at all relevant times, the Grievance Coordinator at CUCF with the rank of Captain.  (*Id*. at 4 ¶ 11; Decl. of Mel Coulter ("Coulter Decl.")(Doc. No. 48) at 1–2 ¶ 5).  Captain Coulter was not a captain over Plaintiff's housing unit at any relevant time.  (*Id.*)

11.     Captain Craig Balls is a Level 3 Grievance Hearing Officer at CUCF.  (*Id*. at 4 ¶ 12.)

12.     Captain Don Taylor is a corrections officer at CUCF with the rank of Captain assigned to CUCF.  (*Id*. at 4 ¶ 13.)

13.     Deputy Warden John Irons, was, at all relevant times, a Deputy Warden at CUCF. (Compl. at 4.)

**LDS Services at CUCF**

14.     The Boulder Programming Area, to which Officers Halleen and Estey, Lieutenant Christensen, and Captain Blood were assigned, is used to facilitate religious services–including LDS religious services–for CUCF inmates.  (*E.g.*, Haleen Decl. at 2 ¶ 5; Blood Decl. at 2 ¶ 6).

15.     LDS religious services are typically held in the Boulder Programming Area each Sunday according to the following schedule: 7:00-8:00 a.m. for choir practice; 8:00-9:00 a.m. for church meeting; 9:00-10:00 a.m. for Sunday school; and 10:00-10:40 a.m. for organ and piano practice.  (*E.g.*, Haleen Decl. at 2 ¶ 6; Blood Decl. at 2 ¶ 7.)

> Plaintiff's Response:  Plaintiff asserts that the 10:00 a.m. hour is designated as
>
> LDS Orientation/Interviews.  (Pl.'s Opp'n Memo at 1.)

16.     At the start of the 10:00 a.m. hour, movement is called for inmates who are not cleared for piano or organ practice to return to their housing units .  (Blood Decl. at 2 ¶ 8.)

>   Plaintiff's Response:  Plaintiff contends that the entire block from 7:00-11:00 a.m. is designated as "open attendance LDS services" for the general population and does not require any additional approval/clearance besides general access to the programming area.  (Pl.'s Opp'n Memo at 2, 11 ¶ 1.)

17.     At the conclusion of LDS worship services at 10:00 a.m., security calls for all inmates to return to their housing units, except those who are involved in the Boulder area choir or are approved for piano and organ practice.  (Blood Decl. at 3 ¶ 9.)

>   Plaintiff's Response:  Plaintiff asserts that the 10:00 a.m. movement is voluntary and that all inmates are encouraged to stay and meet with missionaries, clergy, or sing hymns in the chapel.  (Pl.'s Opp'n Memo at 2, 12 ¶ 3.)

18.     All inmates are required to receive programming clearances from the programming supervisors, who at all times relevant to Plaintiff's Complaint, were Lt. Christensen and Captain Blood.  These clearances are necessary in order to participate in choir practice, and organ or piano practice.  (Blood Decl. at 3 ¶ 10.)

>   Plaintiff's Response:  Plaintiff denies that Sunday choir and organ or piano practice requires additional approval from programming supervisors.  Plaintiff asserts that special approval is only required to participate in those activities on days other than Sunday.  (Pl.'s Opp'n Memo at 3.)

19.     The programming supervisors provide security with a list of inmates who have

been given clearance to attend choir practice.  Also, prior to Sunday, a typewritten list of inmates

who are cleared to practice piano and/or organ ("Organ and Piano List for Bishops for Services")

is provided to the security office.  (Blood Decl. at 3 ¶ 11.)

> Plaintiff's Response:  Plaintiff contends that the 7:00 a.m. choir practice on
>
> Sundays is open attendance and there is no list of enrollment.  (Pl.'s Opp'n Memo
>
> at 3.)

20.     Changes, additions or corrections to the clearance list are typed and computer-

generated by the programming supervisors, not handwritten.  (Blood Decl. at 3 ¶ 12.)

21.     Lists of inmates who are suspended from the Boulder Programming Area are also

posted around the programming office.  Officers understand that these suspension lists are

updated weekly.  (Estey Decl. at 2–3 ¶¶ 9–10.)

**Plaintiff's Access to LDS Group Services in the Boulder Programming Area**

22.     On or about April 15, 2010, Plaintiff was given a thirty-day suspension from the

programming area for possession of an altered item of personal property.  (Compl. at 6 & Ex. A;

*see also* C-Notes USP-000005, *Martinez* Report, Ex. A; Disciplinary History, USP-000054,

*Martinez* Report, Ex. D; Incident Reports, USP-0047,  *Martinez* Report, Ex. C.)

23.      Plaintiff was released from the suspension following an Offender Management

Review (OMR) on May 18, 2010.  (Johnson Decl. at 2 ¶¶ 6–8.)

24.     Plaintiff alleges that on May 23, 2010, he tried to attend LDS services in the

Boulder Programming Area, but was denied by "program security."  (Compl. at 6.)

25.     Because the suspension lists are updated weekly, and because of her work schedule, Officer Haleen's first knowledge that Plaintiff's thirty-day suspension was lifted was on Tuesday, May 25, 2010.  (Haleen Decl. at 3 ¶¶ 13-14.)  Additionally, Officer Haleen was not working on May 23, 2010 and could not have denied Plaintiff any access to the Boulder Programming Area that day.  (*Id.* ¶ 16 & *Martinez* Report, Ex. E, USP000056.)

> Plaintiff's Response:  Plaintiff does not dispute that it was someone other than Haleen who denied him access on this date.  (Pl.'s Opp'n Memo at 3.)

26.     Plaintiff alleges that, on or about July 4, 2010, Officer Haleen sent another inmate to tell Plaintiff that he could not attend LDS services or the "fireside" meeting.  (Compl. at 6 ¶ 3.)

27.     Officer Haleen was not working on Sunday, July 4, 2010, and thus could not have denied Plaintiff any access to the Boulder Programming Area, nor instructed any inmate to deny Plaintiff access to the area on that day.  (*Id.* at 3–4 ¶ 17 & *Martinez* Report, Ex. E, at USP0000059.)

> Plaintiff's Response:  Plaintiff states that the actual date of this incident may have been June 27, 2010, rather than July 4, 2010.  (Pl.'s Opp'n Memo at 4.)

28.     On July 11, 2010, Plaintiff was playing the organ in the Boulder Programming Area at approximately 10:10 a.m., after the conclusion of LDS services.  (Haleen Decl. at 4 ¶ 18; Incident Report, *Martinez* Report, Ex. C, at USP000050; Haleen Decl. at 2 ¶ 6.)  Officer Haleen interrupted Plaintiff's playing because he had not been included on the typewritten list of inmates cleared to play the organ.  (*Id.*; *see also* Compl. at 6 & Ex. B.; Blood Decl. at 3 ¶¶

8

10–11.)  Plaintiff claimed that a volunteer had added his name in pencil, and that his case worker

had approved the privilege.  (Compl. at 6 & Ex. B; Incident Report, at USP000050.)  Based on

her understanding that permission to play the organ must be received from the programming

office, and that the cleared list is normally typewritten, (*see, e.g.*, Blood Decl. at 3 ¶¶ 10–12),

Haleen sent an email to Plaintiff's case worker, Heidi Johnson, to confirm Plaintiff's story.

Johnson responded that Plaintiff was not authorized to play the organ.  (Haleen Decl. at 4 ¶ 20;

Incident Report, at USP000050.)

> <u>Plaintiff's Response:</u>  Plaintiff asserts that October, 19, 2010, was the first time he
>
> was officially restricted from playing the piano or organ.  Plaintiff also asserts
>
> that at the time of the incident Haleen did not have the modified list, which was
>
> not produced until later.  (Pl.'s Opp'n Memo at 4-5.)

29.     Haleen wrote an Administrative Incident Report describing Plaintiff's conduct

and actions.  (Incident Report, *Martinez* Report, Ex. C, at USP000048–50).  Because Plaintiff

was not authorized to play the organ, he was considered "out of bounds."  Haleen further noted

that Plaintiff had lied to her.  (*Id.*)

30.     Based on the Incident Report, Plaintiff underwent an OMR and inmate Case

Action Plan (CAP) conference which resulted in Plaintiff receiving a ninety-day suspension from

all programming, education, and library privileges for being out of bounds.  (Johnson Decl. at 3 ¶

9; Blood Decl at 3 ¶ 13; C-Notes, *Martinez* Report, Ex. A, at USP-000004–05.)  Plaintiff

requested during another OMR one week later, and again in September 2010, to be allowed to

attend religious services, but because the suspension was still in place, his requests were denied. (Johnson Decl. at 3 ¶¶ 10–11; C-Notes, *Martinez* Report, Ex. A, at USP-000004.)

> Plaintiff's Response:  Plaintiff asserts that during this OMR he presented evidence showing that he was on the organ/piano list and was actually cleared for programming at the time of the incident, but his arguments were rejected.  (Pl.'s Opp'n Memo at 10.)

31.     On or about October 19, 2010, Plaintiff had another OMR in which his suspension was lifted and he was given permission to return to programming, including religious services.  Plaintiff was informed, however, that he was not allowed to play the organ or piano without further permission from Captain Blood, and that he was only approved to attend services until the next quarter began.  (Johnson Decl. at 3 ¶ 12; C-Notes, *Martinez* Report,  Ex. A, at USP-000004.)

32.     Officer Haleen was at work on October 19, 2010, and Friday, October 22, 2010, and did not return to work until Sunday, October 24, 2010.  (Haleen Decl. at 5 ¶ 24; Work records, *Martinez* Report, Ex. E, at USP000064.)

33.     On Sunday, October 24, 2010, Officer Haleen refused to allow Plaintiff to attend worship services.  Due to her work schedule Officer Haleen was not aware that Plaintiff's suspension had been lifted.  (Haleen Decl. at 5 ¶ 25.)  Officer Haleen states that, had she known about the change, she would have allowed Plaintiff to attend.  (*Id.*)

34.     On November 21, 2010, after LDS worship services concluded at 10:00 a.m., Plaintiff remained in the Boulder Programming Area.  Plaintiff was told to leave the area, but he

refused.  (Haleen Decl. at 5 ¶ 26.)  Plaintiff first stated that he was attending choir practice and

then stated that he was waiting to see the bishop.  However, Plaintiff did not have permission to

stay for choir and Plaintiff did not follow proper procedures for a bishop visit.  (Haleen Decl. at

5 ¶ 27.)  Plaintiff eventually left the area and Haleen entered a negative C-Note in Plaintiff's

records for lingering and arguing with an officer.  (Haleen Decl. at 6 ¶ 28.)

> Plaintiff's Response:  Plaintiff denies that worship services conclude at 10:00
>
> a.m. or that he refused to leave as directed.  Plaintiff states that he was standing
>
> outside the office waiting to see the bishop.  (Pl.'s Opp'n Memo at 5-6.)  Plaintiff
>
> further asserts that bishop interviews can be arranged in any of three ways: by
>
> signing up on the attendance roll, by making a verbal appointment directly with
>
> clergy, or by simply staying for the hymnal sing-along and waiting for an
>
> opening.  (Pl.'s Opp'n Memo at 12 ¶ 4.)

35.    One week later, on November 28, 2010, Plaintiff again lingered in the Boulder

Programming Area after LDS worship services concluded.  When Officer Haleen told Plaintiff to

return to his housing unit, Plaintiff argued that his case worker had authorized him to remain

after LDS services to play piano and sing.  (Haleen Decl. at 6 ¶ 29.)  Plaintiff was informed that

he had not received permission from programming security (Captain Blood) to remain after

services had concluded or to play the piano.  (*Id.* ¶ 30.)  Officer Haleen entered another negative

C- Note in Plaintiff's records.  (*Id.* ¶ 31; C-Notes, *Martinez* report, Ex. A, at USP000003.)

> Plaintiff's Response:  Plaintiff contends that he was not "lingering" but was
>
> seated in the chapel participating in hymnal sing-along when he was confronted.

11

> Plaintiff also asserts that the lifting of his suspension on October 19, 2010,
> authorized him to remain during this time.  (Pl.'s Opp'n Memo at 6-7.)

36.     On the following Sunday, December 5, 2010, Officer Estey was involved in moving inmates to and from LDS services and auxiliary programming in the Boulder Programming Area.  Estey called for inmates approved to participate in choir practice to come to the chapel at 7:00 a.m..  (Estey Decl. at 3 ¶ 11.)  Plaintiff, who was not cleared to come to the chapel for choir practice, was in the hallway.  Officer Estey instructed Plaintiff to return to his housing unit and reminded him that he had not been approved to attend choir and was not authorized to be in the Boulder Programming Area until 8:00 a.m. for LDS worship services. (*Id.*)  Plaintiff was allowed to attend the services at 8:00 a.m.  (*Id.* at 3 ¶ 12.)

> Plaintiff's Response:  Plaintiff denies that the 7:00 a.m. meeting was "auxiliary
> programming" which required additional authorization.  (Pl.'s Opp'n Memo at 8.)

37.     On December 5, 2010, at 10:00 a.m., after the conclusion of LDS services, Officer Estey called for movement to have all inmates return to their housing units.  The only inmates allowed to remain were the Boulder area choir inmates and those inmates with approval for piano and organ practice, who are called for movement back to their housing units at 10:40 a.m.  (*Id.* at 3 ¶¶ 14-15.)  When Officer Estey moved the choir members at 10:40 a.m., he discovered that Plaintiff was attending choir practice without authorization.  (*Id.* at 3–4, ¶¶ 15–18.)

> Plaintiff's Response:  Plaintiff reiterates his belief that this meeting was open to any inmate allowed in the programming area who wanted to stay and participate. (Pl.'s Opp'n Memo at 8-10.)

38.     As a result of the December 5, 2010, incident, Officer Estey filed an incident report asserting that Plaintiff was out of bounds.  Plaintiff was initially suspended from all programming and education for sixty days.  (*Id.* at 4 ¶ 18; Ex. C at USP000051).

39.     However, on December 6, 2010, Plaintiff had another OMR and CAP meeting in which his suspension was increased to one-year, with reviews to be held every ninety days, based on Plaintiff's repeated failures to follow officers' instructions and being out of bounds. (Johnson Decl. at 3–4 ¶¶ 13; Ex. A at USP000003, Ex. C at USP 000051–53.)  As an alternative to attending LDS services, Plaintiff was allowed to have up to ten religious books in his cell and could request a meeting with an LDS bishop by registering his request with the proper programming staff.  (Coulter Decl. at 4 ¶ 17.)

> Plaintiff's Response:  Plaintiff asserts that during this suspension he was also excluded from the library and was unable to receive books directly from clergy. Plaintiff further asserts that Defendants failed to properly review his suspension regularly.  (Pl.'s Opp'n Memo at 9-10.)

**Plaintiff's Grievances and Alleged Damages**

40.     Plaintiff filed prison grievances regarding various elements of his encounters with staff and his desire to attend LDS worship services and auxiliary programming, and those grievances were addressed.  (Coulter Decl. at 1–5, ¶¶ 7–22.)

13

41.     Plaintiff alleges that as part of his punishment for unauthorized participation in choir practice he was "sent to solitary confinement."  However, Plaintiff's Offender Physical Location History indicates that he was housed in the same cell and bed from January 10, 2009, until December 6, 2010.  (Blood Decl. at 5 ¶ 22; Offender Physical Location History, USP000055, attached to Amended *Martinez* Report.)  This cell is not solitary confinement.  (*Id.*) Plaintiff was moved to a similar cell on December 6 which also was not solitary confinement. (*Id.*)

> Plaintiff's Response:  Plaintiff asserts that the housing section he was moved to on December 6, 2010, "is considered by inmates" to be like solitary confinement, given the strict conditions there.  (Pl.'s Opp'n Memo at 9.)

42.     Plaintiff alleges that, as a result of being denied access to worship services and auxiliary programming, on or about September 7, 2010, he suffered complete mental breakdown, became suicidal, was removed from housing and treated for marking his face.  (Compl. at 15.) Plaintiff also states that he experienced physical symptoms from stress due to the lack of programming.  (*Id.*)  However, records show that Plaintiff was not removed from housing in September 2010.  (Offender Physical Location History, at USP000055).  Plaintiff's medical records show that, although he mentioned suicide, his treating physicians found no potential for self-harm (Gowers Medical 000014, Ex. to Decl. of Renee Springman) and was provided only fish oil (Gowers Medical 000010–13).  The fish oil was later discontinued as unnecessary and there was no diagnosis of depression.  (*Id.*)

### IV.  Legal Standard for Free Exercise Claims

It is well established that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979).  "Inmates clearly retain protections afforded by the First Amendment, *Pell v. Procunier*, 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974), including its directive that no law shall prohibit the free exercise of religion." *Id*.  However, it is also well established that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id*.  "[L]imitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives, including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court established the framework for evaluating the validity of prison regulations that restrict inmates' free exercise rights.[3]  Under *Turner*, such restrictions are constitutional if they are "reasonably related" to legitimate penological interests.  *Id*. at 89.  The *Turner* court identified four factors relevant to the reasonableness determination, which the Tenth Circuit has summarized as follows:

> First, the court considers whether there is a logical connection between the prison regulation and the asserted penological interest. Second, the court considers whether alternative means of exercising

---

[3]  The Tenth Circuit has recognized that the *Turner* framework also applies to individual actions or decisions that interfere with an inmate's religious exercise.  *See Boles v. Neet*, 486 F.3d 1177, 1181 n. 4 (10th Cir. 2007) ("'individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise'" (quoting *Salahuddin v. Goord*, 467 F.3d 263, 274 n. 4 (2d Cir. 2006)).

> the religious right in question remain open to inmates. Third, the court assesses the impact the accommodation of the right in question would have on guards, other inmates, and on the allocation of prison resources.    Fourth, the court considers whether any policy alternatives exist that would accommodate the right in question at de minimis  cost to the prison.

*Hammons v. Saffle*, 348 F.3d 1250, 1255 (10th Cir. 2003) (internal citations omitted).

In applying *Turner's* "reasonable basis" test, courts must give appropriate deference to the expertise of prison authorities.  *Turner*, 482 U.S. at 84.  However, "a reasonableness standard is not toothless" and deference is not a rubber stamp; thus, before acceding to the judgment and discretion of prison administrators, a court should have evidence that their judgment and discretion have been exercised.  *Abbott v. Thornburgh*, 490 U.S. 401, 414 (1989).  Because the reasonable basis test is designed to allow prison administrators to "anticipate security problems," officials can establish a valid, rational connection based on their past experience and intimate knowledge of institutional safety concerns.  *Id.*  An asserted justification must be accepted unless it is "so remote as to render the regulation arbitrary or irrational."  *Turner*, 482 U.S. at 89. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation . . . [while] the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 89-91.

### V.  Sufficiency of Plaintiff's First Amendment Claims

Plaintiff's claims fall into three categories: (1) denial of participation in auxiliary religious activities such as choir, piano or organ practice; (2) random exclusion from worship services despite having authorization to be in the programming area; and, (3) long-term

16

suspension from all activities in the programming area, including worship services, for disciplinary reasons.  The Court will address each of these categories of claims in turn.

## A.  Auxiliary Activities

To support a First Amendment free exercise claim, Plaintiff must present evidence showing that Defendants imposed a substantial burden on his sincerely held religious beliefs. *See Boles*, 486 F.3d at 1182.  Although Plaintiff generally asserts that he is constitutionally entitled to attend "every worship service available at CUCF" (Pl.'s Opp'n Memo at 25 ¶ 32), he has not presented any evidence showing that being excluded from auxiliary activities such as choir, piano/organ practice, or "hymnal sing-alongs," imposed a substantial burden on his religious exercise.  The mere fact that these activities are administered by religious volunteers and are associated with LDS religious services is not sufficient to support the conclusion that they are actually part of Plaintiff's religious observance.  Moreover, Defendants have presented ample evidence showing that these auxiliary activities are not part of LDS worship services, but are special privileges similar to educational or vocational programs requiring separate authorization.  (*See* Second Blood Decl. ¶¶ 15-16, 25.)  Other than his own general statements to the contrary, Plaintiff has not submitted any evidence to refute this position or create a genuine issue of fact.

More importantly, even assuming that participation in these activities could be considered part of Plaintiff's religious observance, the record shows that the restrictions imposed on Plaintiff's participation in these activities were rationally related to legitimate penological objectives.  As discussed in greater detail below (*see* Part V, § C), safety and security concerns

mandate that officials be able to closely monitor and, if necessary, restrict participation in such group activities.  Moreover, the record shows that allowing participation in LDS worship services is a meaningful alternative to participating in these auxiliary activities.  For instance, Plaintiff does not deny that he has opportunities to sing hymns and even join with the choir during worship services.[4]  Finally, Plaintiff has not shown any alternatives that would better facilitate his participation in these activities at *de minimis* cost or with minimal impact on guards, other inmates, or prison resources.

Thus, Defendants are entitled to summary judgment on Plaintiff's claims regarding denial of access to auxiliary activities such as choir, piano/organ practice, or hymnal sing-alongs.

### B.  Random Exclusions from Worship Services

Plaintiff alleges that on several occasions he was excluded from worship services despite having authorization to access the Boulder Programming Area.  Specifically, the record shows that on May 23, 2010 and October 24, 2010, Defendant Haleen or other "program security" prohibited him from attending worship services based on incorrect information about his suspensions.[5]  These incidents both occurred following Plaintiff's suspensions from the programming area for disciplinary reasons.  The record shows that in each of these instances the

---

[4]  It is not clear whether Plaintiff may play the piano or organ during worship services without special authorization.  However, even if doing so could be considered part of Plaintiff's religious observance, this activity obviously cannot be fully accommodated in a prison setting.

[5]  Plaintiff also cites another incident that occurred on either June 27 or July 4, 2010, however, in that incident it appears Plaintiff was allowed to attend worship services, but was told to leave following conclusion of Sunday school at 10:00 a.m..  (Compl. at 6, ¶ 3.)  As discussed previously, exclusion from such auxiliary activities does not violate the First Amendment.

officers who excluded Plaintiff were unaware, due to communication errors, that Plaintiff's suspensions had recently been lifted.  While Plaintiff concedes that these incidents may have resulted from simple communication problems, he contends that the officers involved were negligent in failing to update or check the relevant lists, thereby violating his religious rights.

Even assuming that the officers involved were negligent in excluding Plaintiff from worship services in each of these instances, such mistakes cannot support a First Amendment claim.  In *Gallagher v. Shelton,* 587 F.3d 1063 (10th Cir.  2009), the Tenth Circuit rejected an inmate's claim that he was unconstitutionally denied religious meals due to prison officials' untimely processing of his meal requests.  The Court held that such "isolated acts of negligence . . . would not violate an inmate's First Amendment right to free exercise of religion."  *Id*. at 1070 (citing *White v. Glantz*, 986 F.2d 1431 (Table), 1993 WL 53098, at *2 (10th Cir. Feb. 25, 1993). Instead, the plaintiff was required to show a "'conscious or intentional interference with his free exercise rights'"  *Id*. (quoting *Lovelace v. Lee*, 472 F.3d 174, 201 (4th Cir. 2006)).   Plaintiff has not made such a showing here.

Because the record shows that the random exclusions from worship services cited by Plaintiff were isolated acts, rather than conscious or intentional interference with his free exercise rights, Defendants are entitled to summary judgment on these claims.

### C.  Programming Suspensions

Plaintiff's remaining claims stem from his suspensions from the Boulder Programming Area for disciplinary reasons.  The record shows that from April 15, 2010, through May 18, 2010, July through October 2010, and for one year starting in December 2010, Plaintiff was

excluded entirely from the programming area, which prevented him from attending group worship services and auxiliary programs.  Defendants do not dispute that these suspensions imposed a substantial burden on Plaintiff's right to exercise his religion, however, they contend that the suspensions were reasonably related to legitimate penological interests, as shown by analysis of the four *Turner* factors discussed below.

### i. Rational Connection

Addressing the first *Turner* factor, Defendants have presented evidence showing a rational connection between Plaintiff's suspensions and the legitimate penological objective of maintaining institutional safety and security.  The record shows that each of Plaintiff's progressively longer suspensions were precipitated by his repeated violations of prison rules or failures to follow orders or comply with programming area regulations.  In the first incident, Plaintiff received a thirty-day suspension from the programming area after being found in possession of contraband.  Plaintiff does not dispute the basis for this suspension, and it goes without saying that discouraging possession of contraband is rationally related to promoting institutional safety and security.  In the second incident, Plaintiff received a ninety-day suspension after being formally disciplined for being out of bounds based on playing the piano or organ without approval and for lying to officers.  This suspension was imposed following an OMR hearing in which several officials concurred with the findings and the suspension decision. Finally, in the two-month period after his ninety-day suspension was lifted, Plaintiff was again involved in several more incidents in which he failed to comply with programming rules, argued with officers about his actions, and was found to be out of bounds.  Based on these repeated

incidents, which began almost immediately after his previous suspension was lifted, Plaintiff received a one-year suspension from the programming area.  This suspension was also imposed following an OMR hearing in which officers reviewed the evidence and determined that the suspension was appropriate based on Plaintiff's behavior and history.

Plaintiff seeks to invalidate the suspensions by disagreeing with the rules and interpretation of the facts surrounding each of the incidents where he was reprimanded. However, because there was clearly evidence to support each of the reprimands, the underlying facts are largely immaterial for determining whether Plaintiff's suspensions were reasonably related to legitimate penological objectives.  While Plaintiff believes that some officers were unduly strict in enforcing programming area regulations, Plaintiff has not presented any evidence showing that Defendants unfairly singled him out or enforced the regulations against him in a discriminatory or retaliatory manner.  Although the record shows that officers may have paid closer attention to Plaintiff than to other inmates, such attention was justified based on Plaintiff's pattern of misconduct and the need to ensure security in the programming area.  It was this pattern of misconduct that led officers to believe that restrictions and escalating suspensions were necessary to ensure Plaintiff's strict compliance with programming area regulations.

Plaintiff also appears to challenge the suspensions by arguing that, given the religious implications of programming area activities, prison officials cannot use restrictions from these activities as a form of punishment.  Plaintiff essentially argues that inmates approved to access the programming area should be free to participate in any activities they choose, and that specific restrictions on participation cannot be imposed by corrections officials, but are left to the

21

discretion of religious volunteers.  Hence, Plaintiff's apparent rejection of the notion that special

approval may be required for Sunday activities other than worship services (i.e. choir,

piano/organ practice, bishop interviews, "fireside" meetings, etc.).  Plaintiff has not offered any

legal support for this assertion, which clearly runs contrary to established law.  Under *Turner*,

such restrictions are valid so long as they are reasonably related to the legitimate penological

objectives at issue.  Thus, the relevant question here is not whether each of the reprimands

Plaintiff received were warranted, but whether the restrictions and suspensions imposed upon

him were rationally related to legitimate penological objectives.

   The record shows that the restrictions and suspensions here were not punitive, but were

directly tied to maintaining safety and security in the programming area and ensuring Plaintiff's

compliance with rules and regulations governing participation.  Despite Plaintiff's explanations

for his conduct, the record shows that Plaintiff repeatedly abused his programming privileges

and challenged the authority of officers responsible for maintaining program security.  Plaintiff's

pattern of behavior shows that he did not appreciate the seriousness with which prison officials

viewed the numerous reprimands he received and, instead, confronted the officers with

overstepping their bounds by interfering with his religious observance.  Under these

circumstances it was within Defendants' discretion to place progressively more severe

restrictions on Plaintiff's access to the programming area, including imposing escalating

suspensions, in order to ensure Plaintiff's full compliance.  On the record presented it appears

that prison officials may have allowed some uncertainty about which activities required

preapproval for attendance.  Plaintiff repeatedly asserts an understanding that is different from

the sworn statements of Defendants, who do not offer any written policy statements, postings or written notices to support their assertions.  Thus, prison management may have contributed to confusion that resulted in Plaintiff "lingering" to sing or play the piano or organ after he should have returned to his cell.  This conduct, however, persisted after Plaintiff had been told several times he needed clearance, thus supporting the prison officials' judgment that additional restrictions were required to address Plaintiff's disregard for the rules.  It also appears on distant review that the punishment imposed was unnecessarily harsh for the nature of the offenses.  Nevertheless, the nature and type of discipline imposed, within reason, is left to the sound discretion of prison officials.  They are charged with maintaining security under the conditions in the programming area, where large numbers of inmates have direct interaction with each other and with outside volunteers under limited supervision.  They are in the best position to make judgments about the nature and type of discipline required.  Nothing on this record supports a claim that their exercise of discretion in this exceeded the authority given to them.

Thus, the Court finds that the first *Turner* factor weighs heavily in Defendants' favor.

### ii.  Alternatives for Practicing Religion

The second *Turner* factor requires the Court to consider whether Plaintiff had alternative means of exercising his religion during the time he was suspended from participating in group worship services.  Defendants assert that throughout Plaintiff's suspensions he was able to exercise his religion through access to religious books and visits with clergy members.  Plaintiff argues that he was denied meaningful alternatives because his access to religious books was limited and many of his requests for clergy visits were ignored or denied.

Regarding access to religious books, the record shows that Plaintiff was allowed to have up to ten books in his cell at all times, including religious books of his choice.  Although Plaintiff admits having access to religious books, he states that he was unable to borrow library books following his transfer to Section 6 and was also prevented from receiving books directly from clergy.  Even accepting these allegations as true, it is undisputed that Plaintiff could obtain religious books through official channels and that he was able to continue his religious studies during his suspensions.  Moreover, Plaintiff has not identified any specific books necessary to his religious observance that were denied to him.

Similarly, Plaintiff has not alleged facts or presented admissible evidence showing that he was prohibited from visiting with clergy while suspended from group worship services.  In his opposition memorandum Plaintiff states for the first time that he was denied such visits and includes a list of his "unsuccessful requests to meet with an LDS bishop" during his one-year suspension.  (Pl.'s Opp'n Memo at 23.)  Although Plaintiff cites instances where his requests for clergy visits–mostly through informal channels–were unsuccessful, he admits to receiving at least two such visits during his suspension.  Moreover, Plaintiff's Complaint does not assert a separate claim based on denial of clergy visits, but focuses exclusively on his suspension from group religious services.

Thus, the records shows that Plaintiff was afforded alternative means of exercising his religion while suspended from group worship services.

### iii.  Third and Fourth *Turner* Factors

Because Plaintiff's claims stem from the decision to restrict him from the programming area for safety and security reasons, rather than from a generally applicable policy or practice, the remaining *Turner* factors have limited relevance here.  However, to the extent they apply to Plaintiff's claims, these factors also support the conclusion that Plaintiff's suspensions pass muster under *Turner*.

Regarding the third *Turner* factor, there is no evidence that Plaintiff's right to participate in group worship services could have been better accommodated without undermining the legitimate objective of ensuring Plaintiff's compliance with programming area regulations.  As previously discussed, the decision to suspend Plaintiff from these activities was not an unreasoned, punitive reaction, but was made only after Plaintiff repeatedly abused his programming privileges and challenged the authority of programming officers.  Defendants initially tried to correct Plaintiff's behavior by restricting him only from auxiliary activities, while still allowing him to attend worship services.  However, given the large number of inmates involved, the limited staff available, and Plaintiff's continued misconduct, this less-restrictive alternative proved inadequate and unworkable.  Notably, Plaintiff has not presented any less restrictive alternative that could have been pursued; instead, he continues to assert that any restriction at all on his access to the programming area violates his rights under the First Amendment.  (Pl.'s Opp'n Memo at 25 ¶ 32.)  Under these circumstances, it is apparent that any effort to further accommodate Plaintiff would have significantly impacted guards, other inmates, and the allocation of prison resources.

Similarly, Plaintiff has not shown that any policy alternatives existed that would have accommodated his right to attend group worship services at *de minimis* cost to the prison. Although the prison presumably could have provided a personal chaperone for Plaintiff, or perhaps significantly increased the number of staff tasked with monitoring services and ensuring Plaintiff's compliance with programming rules, such alternatives obviously would have had a substantial impact on prison resources.

Thus, consideration of the third and fourth *Turner* factors also supports the conclusion that Plaintiff's suspensions were reasonable under the First Amendment.

## VI.  Conclusion

Having throughly reviewed the substantial record in this case, the Court finds that Plaintiff has not met his burden of showing any genuine issues of material fact requiring a trial. The facts Plaintiff offers to suggest a dispute are either usupported or supported only by Plaintiff's conclusory assertions.  Other facts Plaintiff cites to raise a genuine issue are not material, meaning the court would be required to reach the same conclusion even if the facts were accepted as true.  The evidence here does not support the conclusion that Plaintiff's First Amendment right to exercise his religion was violated.  Instead, the record shows that any infringement of Plaintiff's religious rights was reasonably related to legitimate penological objectives as required under controlling Supreme Court precedent.  *See Turner*, 482 U.S. at 89. Because Plaintiff has not shown a constitutional violation, there is no need to address the issue of qualified immunity, and Defendants are entitled to summary judgment on Plaintiff's claims.

**ORDER**

Accordingly, **IT IS HEREBY ORDERED** that:

(1) Defendants' Motion for Summary Judgment (Doc. No. 60) is **GRANTED**; and,

(2) this case is **CLOSED**.

DATED this 4th day of April, 2013.

BY THE COURT:

CLARK WADDOUPS
United States District Judge